Sabrina L. Shadi, Bar No. 205405
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA  90025-0509
Telephone:   310.820.8800
Facsimile:   310.820.8859
Email:       sshadi@bakerlaw.com

Attorneys for Defendant
Scripps Media, Inc., improperly sued as
KERO TV-23 and The E.W. Scripps Company

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALFORNIA

| | |
|---|---|
| AMY J. BURDICK,<br><br>                    Plaintiff,<br><br>       v.<br><br>KERO TV-23, a Business Entity, Form Unknown, THE E.W. SCRIPPS COMPANY, an Ohio Corporation, and DOES 1 THROUGH 50, INCLUSIVE,<br><br>                    Defendants. | Case No.:<br><br>**NOTICE OF REMOVAL OF CIVIL ACTION TO FEDERAL COURT**<br><br>[Filed concurrently with Civil Cover Sheet; Declaration of Kathleen Kenney; Corporate Disclosure Statement]<br><br>Action Filed:     January 13, 2017 |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

NOTICE OF REMOVALOF CIVIL ACTION TO FEDERAL COURT

610671283.1

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1441 and 1446, Scripps Media, Inc., improperly sued as KERO TV-23 and The E.W. Scripps Company ("Scripps Media"), hereby removes the action filed by Amy J. Burdick ("Plaintiff") in the Superior Court of the State of California, in and for the County of Kern, and captioned Case No. BCV-16-102973, to the United States District Court for the Central District of California.

## JURISDICTION AND VENUE

1.     Scripps Media asserts that this is a civil action over which this Court has original subject matter jurisdiction under 28 U.S.C. § 1332, and removal is proper under 28 U.S.C. § 1441 in that it is a civil action between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

2.     This Court is in the judicial district and division embracing the place where the state court case was brought and is pending.  Thus, this Court is the proper district court to which this case should be removed.  28 U.S.C. §§ 1441(a) and 1446(a).

## THE ACTION

3.     On December 27, 2017, Plaintiff filed a Complaint (the "Complaint") against KERO TV-23 and The E.W. Scripps Company, in the Superior Court of the State of California, in and for the County of Kern, Case No. BCV-16-102973 DRL (the "State Court Action").

4.     A copy of the Complaint filed in the State Court Action is attached as Exhibit A.

## DIVERSITY OF CITIZENSHIP

5.     **Plaintiff's Citizenship**.  As alleged in the complaint, Amy J. Burdick is a resident of Bakersfield, California.  Complaint, ¶ 1.  For diversity purposes, a person is a "citizen" of the state in which he or she is domiciled.  *Kantor v.*

- 2 -

NOTICE OF REMOVAL OF CIVIL ACTION TO FEDERAL COURT

610671283.1

*Wellesley Galleries, Ltd.*, 704 F.2d 1088, 1090 (9th Cir. 1983). Residence is prima facie evidence of domicile. *State Farm Mutual Auto Ins. Co. v. Dyer*, 19 F. 3d 514, 520 (10th Cir. 1994). Accordingly, Plaintiff is a citizen of the State of California.

6. **Defendant's Citizenship**. Pursuant to 28 U.S.C. § 1332(c), "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." The United States Supreme Court has concluded that a corporation's "principal place of business" is "where a corporation's officers direct, control, and coordinate the corporation's activities," or its "nerve center." *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192 (2010).

7. Scripps Media, Plaintiff's former legal employer, was improperly sued as KERO-TV and The E.W. Scripps Company. KERO-TV is not a legal entity. It is a television station. (See Declaration of Kathleen Kenney¶2). As of January 2012, a date which precedes the relevant limitations period for each of Plaintiff's claims, individuals who have worked at KERO-TV, including Ms. Burdick, were employed by Scripps Media (*Id.*). Scripps Media is, and was at the time the State Court Action was commenced, incorporated in the State of Delaware. Scripps Media's principal place of business is in Ohio. Specifically, Scripps Media's headquarters are located in Cincinnati, Ohio. Accordingly, Scripps Media is a citizen of the States of Delaware and Ohio, and not a citizen of the State of California.

8. **Doe Defendants.** Although Plaintiff has also named fictitious defendants "Does 1 to 100," 28 U.S.C. § 1441(a) provides, "[f]or purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded." *See also Fristos v. Reynolds Metals Co.*, 615 F.2d 1209, 1213 (9th Cir. 1980) (unnamed defendants are not required to join in a removal petition). Thus, the existence of "Doe" defendants does not deprive the Court of jurisdiction.

- 3 -

610671283.1

9. **Diversity**. Complete diversity of citizenship exists under 28 U.S.C. §§ 1332 inasmuch as Plaintiff is a citizen of the State of California, and Scripps Media is a citizen of Delaware and Ohio.

## AMOUNT IN CONTROVERSY

10. A defendant may remove a case to federal court pursuant to 28 U.S.C. § 1332(a) on the grounds that the amount in controversy exceeds $75,000.

11. This action involves Plaintiff's alleged claims for: breach of contract, sexual harassment and discrimination and retaliation, breach of covenant of good faith and fair dealing, wrongful/constructive termination, failure to properly supervise, intentional infliction of emotional distress, tortious interference with prospective business advantage and unfair competition.

12. In connection with these claims, Plaintiff has alleged that she has been damaged in an amount that is "believed to be in excess of $100,000" for loss of commissions and an amount in excess of $100,000 in connection with Plaintiff's alleged constructive/actual termination. (See Complaint, ¶¶94 and 99).

13. Plaintiff also claims that she has suffered emotional distress damages. (See Complaint at ¶ 106) Emotional distress damages may be considered when calculating the amount in controversy. *Simmons v. PCR Tech.*, 209 F. Supp. 2d 1029, 1034 (N.D. Cal. 2002).

14. In addition, Plaintiff seeks the imposition of punitive damages. (See Complaint, ¶¶ 107, 114 and 120.) "In determining the amount in controversy, the court must consider the amount of actual and punitive damages." *Nasiri v. Allstate Indem. Co.*, 41 Fed. Appx. 76, 77 (9th Cir. 2002); see also *Gibson v. Chrysler Corp.*, 261 F.3d 927, 946 (9th Cir. 2001) (stating that "[i]t is well established that punitive damages are part of the amount in controversy in a civil action.").

15. Plaintiff also seeks attorneys' fees pursuant to California Government Code Section 12965(b). (See Prayer for Relief, ¶5). "[W]here an underlying statute authorizes an award of attorneys' fees, either with mandatory or

- 4 -

610671283.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

discretionary language, such fees may be included in the amount in controversy." *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998).

16.    **Total Amount in Controversy**. Plaintiff's pleadings make it facially plain that she is seeking far more than the minimum amount, exclusive of interest and costs, needed to meet the amount in controversy requirement. *See, e.g. Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 980 (9th Cir. 2005) (finding, by preponderance of the evidence, that a complaint exceeded $75,000 where it sought damages for lost wages, benefits, 401(k) contributions, value of life insurance policies, stock options, emotional distress damages, and attorney's fees and costs).

17.    As required by 28 U.S.C. § 1446(d), Scripps Media is providing written notice of the filing of this Notice of Removal to Plaintiff, and is filing a copy of this Notice of Removal with the Clerk of the Superior Court of the State of California, in and for the County of Santa Clara.

Respectfully submitted,

Dated:  April 27, 2017

BAKER & HOSTETLER LLP

By:  *Sabrina L. Shadi*
Sabrina L. Shadi

Attorneys for Scripps Media, Inc., improperly sued as KERO TV-23 and E.W. Scripps Company

- 5 -

NOTICE OF REMOVAL OF CIVIL ACTION TO FEDERAL COURT

610671283.1

# EXHIBIT A

FILED
SUPERIOR COURT, METROPOLITAN DIVISION
COUNTY OF KERN

DEC 27 2016

TERRY McNALLY, CLERK
BY_____DEPUTY

Jeffrey L. Wise, Esq.: SBN 198725
**WISE LAW OFFICE**
1315 "L" Street
Bakersfield, California 93301
Telephone: (661) 327-0622
Facsimile: (661) 328-9977

Attorney for Plaintiff, Amy BURDICK

**NOTICE OF ASSIGNMENT AND
CASE MANAGEMENT CONFERENCE :**

Assigned to __DAVID R. LAMPE__ for all purposes.

Hearing Date: ___6/26/17___

Time: ___8:30 am___

Department: ___11___

See CRC Rule 3.720 Et. Seq.

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF KERN, METROPOLITAN DIVISION

AMY J. BURDICK,

Plaintiff,

vs.

KERO TV-23, a Business Entity, Form Unknown, THE E. W. SCRIPPS COMPANY, an Ohio Corporation, and DOES 1 through 50, inclusive,

DEFENDANTS.

Case No.: **B C V - 1 6 - 1 0 2 9 7 3**

**DRL**

**COMPLAINT FOR:**
1) **BREACH OF CONTRACT**
   A. **Commissions**
   B. **Employment Terms**
2) **SEXUAL HARASSMENT, DISCRIMINATION and RETALIATION**
3) **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
4) **WRONGFUL/CONSTRUCTIVE TERMINATION IN VIOLATION OF PUBLIC POLICY**
5) **FAILURE TO PROPERLY SUPERVISE**
6) **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
7) **TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE**
8) **VIOLATION OF BUSINESS AND PROFESSIONS CODE §17200**

COMES NOW Complainant AMY J. BURDICK ("BURDICK") for herself and no one else, and alleges as follows:

COMPLAINT

1. BURDICK is currently, and at all times relevant to the actions set forth herein, was a resident in Bakersfield, Kern County, California.

2. Plaintiff is informed and believes, and based thereupon alleges that DEFENDANT, KERO TV-23, ("KERO"), is a legally existing entity, form of which is unknown, that operates and is located in Bakersfield, Kern County, California.

3. Plaintiff is informed and believes, and based thereupon alleges that DEFENDANT, THE E.W. SCRIPPS COMPANY, ("SCRIPPS") is an Ohio Corporation, currently doing business in California, and at all times relevant is the owner of KERO TV-23, ("KERO"), which operates and is located in Bakersfield, California.

4. BURDICK is ignorant of the true names and capacities of the DEFENDANTS sued herein as DOES 1 through 50, inclusive, and therefore sues DOES 1 through 50, inclusive, by these fictitious names. BURDICK is informed and believes, and thereon alleges that DOES 1 through 50, inclusive, are responsible in some manner for the occurrences and acts complained of and that the damages as alleged herein may have been, in whole or in part, directly and proximately caused by these DOE DEFENDANTS. BURDICK will seek leave to amend this Complaint when the true names and capacities of the DOE DEFENDANTS have been ascertained.

5. BURDICK is informed and believes, and based thereon allege that at all relevant times the DEFENDANTS herein, and each of them, were the agents, servants, representatives, subsidiaries, "alter ego's", or employees of each of the other DEFENDANTS, and that such acts as alleged were performed within the course and scope of their authority, employment, representation and/or agency.

6. Whenever and wherever reference is made in this complaint to any act by a DEFENDANT or DEFENDANTS, such allegations and reference shall also be deemed to mean the acts and failures to act of each DEFENDANT acting individually, jointly and severally.

7. Whenever and wherever reference is made to individuals who are not named as Plaintiffs or DEFENDANTS in this complaint but were employees/agents of

one or more of the DEFENDANTS herein, such individuals at all relevant times acted on behalf of one or more of the DEFENDANTS within the course and scope of their employment.

8.      At all times relevant herein, DEFENDANTS are an employer within the meaning of Government Code section 12926(d) and subject to the provision of the California Fair Employment and Housing Act (FEHA), Government Code section 12900 et seq., in that DEFENDANTS regularly employed five or more persons. As an employer, DEFENDANTS are barred from discriminating and retaliating in employment decisions on the basis of sex, race, color, national origin, disability and/or ancestry, and are prohibited from sexually harassing and/or creating a hostile working environment based on the same. As an employer, DEFENDANTS had an affirmative obligation to take all reasonable steps necessary to prevent discrimination and retaliation from occurring.

9.      BURDICK filed a complaint against DEFENDANTS with the Department of Fair Employment and Housing ("DFEH") on or about December 31, 2015. On December 31, 2015, BURDICK received her right to sue letter from the DFEH, and has thus exhausted her administrative remedies. A true and correct copy of the Right to Sue letter from the DFEH is attached, as Exhibit "A," hereto and incorporated as though set forth herein.

10.     The damages sought by Plaintiff exceed the minimum jurisdictional amount of this court, and therefore this court has jurisdiction of this matter.

11.     On or about April 1, 2011, BURDICK began her employment with KERO for the Bakersfield, California market with the expectation of doing marketing and sales.

12.     From the time of hire, BURDICK's pay was based 100% upon commissions. She was also informed that she would be required to repay any commissions paid on accounts that later fail to pay ("chargebacks").

13.     On or about April 24, 2011, Steve McEvoy from KERO sent BURDICK to San Diego for training. At that time, Mrs. BURDICK informed him that she would prefer

3
COMPLAINT

not to go as it would require her to be gone during her twin children's birthday, to which he informed her "your career is more important than your kids' birthday, and you'll have plenty more birthdays to spend with them."

14. In or about the first of September, 2011, BURDICK approached her manager, David Eggers with information regarding a competitor's plan to do a new presentation to the market and suggested that KERO come up with a package and/or presentation to compete with them so as not to lose business to them. After listening to BURDICK, Eggers then said, "you've got a little something brown there on the end of your nose", and laughed. BURDICK then asked, "did you just call me a brown noser for suggesting that we get ahead of our competition?", to which Eggers replied, "call it what you'd like, but it sure sounds like brown nosing to me."

15. On or about September 28, 2011, during a driving trip to Tehachapi for a sales meeting with Steve McEvoy, McEvoy asked BURDICK to hand him the paper with directions and as she does, he reached for them and brushed against her left breast. At that time, both of them stop, and he comments, "gosh, I'm sorry, unless you're not sorry." Not comfortable with what McEvoy was implying, BURDICK responded "I know that was unintentional on your part, so I won't say anything about it." McEvoy responded saying, "Thank you- I can't really have another woman suggesting that I sexually harassed them."

16. In or about January, 2012, E.W. SCRIPPS acquired KERO. At that time, they required BURDICK to execute a new contract. (Copy attached as Exhibit B)

17. In April of 2012, David Eggers and Steve McEvoy were fired by SCRIPPS. On September 25, 2013, during a discussion with her new supervisor, Jim Crow, BURDICK and Crow were discussing a new sale that BURDICK had made. At that time, Crow told BURDICK, "Give me a hug. YOU'RE THE MAN!!" for having made the sale. Crow also commented, "you're the strongest A.E [Account Executive] we have here."

18. During the same discussion on or about September 25, 2013, BURDICK and Crow had a dispute over certain terms of the agreement. During the discussion,

Crow would constantly interrupt and talk over BURDICK, and was at times yelling towards BURDICK. After the conversation, BURDICK asked her manager, Peter Gunn, whom had been involved in parts of the discussion, "I need you to tell me if I'm out of line, or being unclear, because I've never had a manager talk to me like this, and honestly I'm here asking you rather than going to H.R. with this." After discussing the issue with Gunn and from his response, BURDICK felt more comfortable, and believed that KERO would thereafter properly manage the situation.

19. During the month of January, 2104, Jim Crow was terminated. Also during January, KERO posted a job opening for a Local Sales Manager (LSM) position at KERO. This position would have been an advancement for BURDICK.

20. During that January, BURDICK asked her manager, Gunn, if she could apply for the job, as was explained to her prior was the standard procedure before applying for a new position. In response Gunn told her "No", and upon asking why, Gunn explained to her that it was "because you don't have enough experience." As a result, BURDICK did not apply.

21. Later that month, BURDICK learned that a young male from Pittsburgh, Pennsylvania had been hired from a competitor station to take the LSM position at the Bakersfield station. When BURDICK asked about his background, she learned that he had approximately 4 years of television experience, while at that time BURDICK had 13 years of experience.

22. During the month of January, 2014, Steve Taylor, the Creative Services Director, called BURDICK on her cell phone to discuss a video shoot that had been planned for a KERO client. Taylor began the conversation by yelling at her about the plans. When she finally had a chance, BURDICK explained to Taylor that this is no longer her client, and that Peter Gunn had set the shoot up. However, Taylor ignored the information and continued yelling at BURDICK about the need to properly schedule things so as not to waste other personnel's time. BURDICK again tried to explain that

5

COMPLAINT

this is not her client, and after more yelling by Taylor, she explained that he needed to call Peter Gunn to discuss the matter.

23. Later that day, BURDICK went to discuss the incident with Nancy Solis, the Human Resource Manager for KERO and expressed to her that this type of situation had happened many times while working at KERO, and that it was very frustrating and emotionally exhausting to be constantly yelled at and not listened to when she tried to respond and address the situation. During the meeting, Solis took notes and asked what BURDICK would prefer to see happen, to which BURDICK responded that she would like him to stop yelling and speaking to her like that and listen to her input. In response, Solis informs BURDICK that Taylor was already receiving counseling from her and the General Manager, Steve Weinstein about his behavior.

24. After going to H.R. with the issue, BURDICK informed her manager, Gunn about her conversation with Solis, to which he replied, "I really wish you hadn't done that, you have no idea the pressure he [Taylor] is under." BURDICK responded, telling Gunn, "I understand that things are difficult for him, but he creates a tremendous amount of pressure on me when he treats me like that."

25. On or about February 12, 2014, BURDICK spoke with Gunn about why she was not allowed to previously apply for the LSM position, and reminded Gunn that he had told her it was because she "didn't have enough experience". She again explained that she had a total of 13 years of experience, and the new hire only had 4. In response, Gunn replied, "I just wanted you to have one more really great year before you got to move up. This job is hard and you deserved one more year of great pay and a flexible schedule."

26. On or about February 19, 2014, Justin Chambers directed the first Sales Meeting, wherein he spent over an hour discussing how he felt that the entire sales team wasn't "doing enough" and isn't "working hard enough", despite the fact that KERO had 4 sales reps, while all competitors had at least twice as many to fulfill the duties.

27.    During a "one on one" meeting that day with Chambers, he asked BURDICK why she hadn't listed any "new business" calls for the week, to which she explained that she had been very busy with transactional calls and didn't feel it was an issue, as she was already very near to meeting her New Business goals that had been set for the *year*. Additionally, BURDICK noted to Chambers, as she had on numerous occasions, that being required to stay in the office and make calls prohibited and interfered with her from doing her job duties outside of the office. In response, Chambers asked, "so does that mean once you hit your goal you'll stop working?", to which BURDICK replied, "not at all, I just ran out of time between all the meetings in the office and preparing my numbers for this meeting, and all of my other business to get you a list of calls." Chamber's reply was in a diminutive tone that "you're required to make new business calls every week, even if you're at goal."

28.    On or about April 22, 2014, during a discussion with Chambers, Chambers raised his voice and began yelling at BURDICK. After the conversation, a co-worker approached BURDICK and asked, "are you ok?", to which BURDICK said, "Yes, why?" The co-employee commented, "Justin was yelling at you, everyone could hear it", to which BURDICK responded, "I know, I kept trying to speak in a softer voice so he would lower his voice".

29.    On or about June 13, 2014, while on a pre-planned family vacation, Chambers called BURDICK on her cell phone to ask for her help in regards to a client which he had pre-empted out of an NBA game. Subsequently, Chambers emailed BURDICK demanding that she "bring him up to speed" and address the issue for him.

30.    On or about June 23, 2014, BURDICK had an angry client call regarding rate increases and some other issues. The client in question was the station's #2 largest advertising buyer, and had over $20,000.00 in purchases set for July. BURDICK approached Burkes Young, the Director of Sales for the station that had been hired approximately 6 weeks earlier, to discuss the issues. However, Young became very defensive, informing her that he didn't even recognize or know who the client was, and

that she couldn't try to place any blame on him. In response, she simply told him that she would "figure it out" and get back to him about it.

31.    On or about June 24, BURDICK approached Young to discuss the issue, and that she had resolved the problem from the day before. However, she also informed him that she was concerned about his response to her request for information and input the day before, to which he simply replied that she was "in the wrong", and should have come to him or Justin Chambers and "asked for their help". BURDICK explained that she had never needed help on a transaction with this client before, that she had been handling the client for a long time, and that the issue was over a simple error that was very quickly rectified and resolved once she was able to get the information she needed.

32.    In response to BURDICK's informing him that she didn't "need help" to complete her duties, Young responded that it didn't matter, that she needed to bring *all* of her buys to Chambers, and that she had to report to Justin and learn how to let him "help" her, "because he has a lot of experience" and that he was there to "make [her] job easier." At that time, BURDICK informed Young what she really needed was for him and KERO management to be more helpful and accessible in the process, especially as this was a large client for both her and the station. However, Young responded to her that she had "made a mistake" and was refusing to admit she had done so, that she just wanted to "throw a manager under the bus", and that her response was unacceptable.

33.    In response to this incident and from the built up frustration, as well as being unsure as to what "mistake" she was being blamed for making, BURDICK began to cry. She then said, "I'm embarrassed and need a moment", to which Young told her not to leave. However, she stepped out of the office to the restroom to recompose herself. When she returned, she told Young, "I apologize and it won't happen again", to which Young responded, "Thank you."

34.    In or about late June to early July, 2014, based upon the ongoing problems and issues with KERO, and the lack of management's efforts to address

them, BURDICK applied for a position with another company. Having learned that she had applied for the position from someone in the market, Steve Weinstein had informed the entire management group at KERO that she had applied for the job. On or about July 14, 2014, BURDICK met with Weinstein to discuss the issue and stated, "You know I had to apply, I couldn't pass up the opportunity to advance my career." In response, Weinstein informed her, "you and I both know that you would have never been able to do that job." Shocked from this comment, BURDICK responded and stated, "well, I wasn't allowed to interview for a manager job here and this was a great opportunity so I felt that I needed to take the interview when I was asked to meet with the GM over there." Weinstein replied to BURDICK, "I'll deny it if you say I said this, but you know that our company will not promote someone to management at the same station they were non-management in." BURDICK responded that, "Yes, I've heard that's how things are done, but I'm not in a position to move to another state, you know that." His response was, "I do know that, so my advice would be that we should sit down with Nancy [Solis, HR Manager] and write up some milestones for you to hit in order for me to be able to lobby for you to get promoted here at this station. I will schedule some time with Nancy for us to meet. In the meantime you need to pursue your MBA so that you have that on your resume, corporate will love it." At this time, Burdick was one of, if not the highest performing person in her position with the station.

35.    On or about September 4, 2014, BURDICK was in a mandatory Sales Team meeting, and received a text message from Justin Chambers, whom was also in the meeting, informing her that Steve Taylor, (then Director of Creative Services) wanted to speak with her. BURDICK then walked over to Chambers and whispered that her day is really busy, so she was going to step out of the meeting to speak with Taylor at that time. Outside the meeting room, Taylor began the conversation discussing a production order BURDICK had placed, and BURDICK then explained what she needed from Taylor, and that she needed to get back in to the training meeting. Taylor then told BURDICK, "Come see me when you're done", to which BURDICK replied that "my day

is crazy and I'm pretty much full all day." Taylor's response to BURDICK was "well maybe when you step out to take a potty break you can come down to my office." In reply to Taylor, BURDICK states, "Steve, that is so offensive, please do not say things like that to me again", at which point Taylor began to get loud and defensive. After this exchange BURDICK left telling Taylor, "ok, I'll take care of it."

36.    As BURDICK was walking away from the encounter with Taylor, another employee approached her and commented, "Amy you were so rude, I can't believe you talked to Steve like that." BURDICK responded to her saying, "did you hear what he said to me?", to which she responded, "that doesn't matter...".

37.    After the confrontation with Taylor and the other employee, BURDICK was feeling emotionally overwhelmed, and went to Burkes Young to inform him of the events and that she needed to leave for the day. As Young was walking her out of the building, she asked "did you hear all of that", to which he replied "No." She responded and informed him that Steve had been yelling at her and she had been trying to defend herself, within earshot of the "bullpen" of other employees, and that the other employee had stepped in and commented. Young's reply was simply, "I didn't hear it so I can't say what happened."

38.    As a result of the incident and ongoing issues, BURDICK was required to seek medical advice from her doctor, and was given various prescriptions for anxiety and to calm her down.

39.    On September 5, 2014, upon returning to work, Yolanda Gum called BURDICK into her office and apologized to her for the co-employee's comments to her, and that she had spoken with the co-employee telling her that she should not have intervened as she was not privy to the events that had occurred between BURDICK and Taylor, noting that it did nothing but create additional anxiety and tension in the situation.

40.    In or about October, 2014, BURDICK received a message from Michael O'Brian, Vice President of Sales at the corporate office of E.W. SCRIPPS, thanking her

for all of her efforts at the station, and congratulating her for being in the top 25 (out of over 150 A.E.'s with E.W. SCRIPPS) to hit or exceed all of their pre-set "goals" for the third quarter.

41.    In or about early October, 2014, as a result of not being able to get out of the office to meet with clients and potential clients and to actually perform her job duties conducting outside sales resulting from the numerous and repetitive meetings required by her supervisors inside the office, as well as the document requirements, cold-call requirements, and other general office work being required, BURDICK approached Burkes Young about the potential of implementing a flexible work schedule as other employees did at the Colorado station. Young appeared open to the idea and asked her to put in writing what she wanted (job sharing with two representatives shaving one desk), and that he would speak to the other rep, Lupe, to see if he would have any interest in such an idea. BURDICK also spoke with Lupe, wherein he indicated that he would "love" to do that as long as the company did not pull any accounts away from either of them.

42.    Shortly thereafter, Young responded to BURDICK and told her that he had spoken with Lupe, and Lupe had told him that he was not interested in the job sharing idea. Young offered BURDICK no explanation as to why. During this discussion, however, Young stated that he had spoken with Michael O'Brian, whom had indicated said he didn't care where BURDICK worked, or if she comes into the office or not, as long as she "produced" as she had been doing, he was satisfied and she could work any schedule she wanted.

43.    In or about the end of October, 2014, Nancy Solis, the H.R. Manager, called BURDICK into her office to explain the procedure for setting up a flexible work schedule. BURDICK repeated to Solis that she simply needed to find a way to be out of the office and in the field more often to perform her job properly, and not have to spend so much time in the office dealing with the constant micro-managing and problems with her superior, Justin Chambers. BURDICK also explained that she was constantly

11
COMPLAINT

feeling overwhelmed due to the constant mandatory meetings, the amount of desk work required, and Chamber's constant scrutinizing of where she was going and with whom she was meeting. Solis' response during the meeting was simply that any flex schedule had to benefit the company and not the employee, and that the only way to get one was to prove to the company that she could produce the same sales or more with it.

44.    During the meeting with Solis, BURDICK was visibly upset and kept apologizing to her for crying. Solis' reply was simply, "mm hmm", and took no notes during the meeting.

45.    As a result of the meeting with Solis, BURDICK believed pursuing a flex schedule was clearly futile, and dropped the idea.

46.    Also during the month of October, BURDICK had a discussion with Burkes Young regarding setting of rates for certain of her clients. During this discussion, BURDICK explained that the restructure and handling of her clients by the station was going to create a considerable amount of additional paperwork for her to do to conform to the record production/keeping requirements set for her, and that it would keep her at her desk for a considerable amount of time precluding her from doing her position of outside sales. Young's reply was, "This is business Amy, this is how we are going to handle this."

47.    During 2014, DEFENDANTS had informed BURDICK that since she was out-performing the other AE's and making considerably more income than them, they wanted to move some of her existing clients and accounts to other AE's to provide them more income. Based upon comments and innuendos made by her supervisors and others, BURDICK understood and believed that this was because they felt it was inappropriate for a female to be earning considerably more than the males in the position.

48.    On or about November 17, 2014, Steve Taylor scheduled a video shoot which required a sign language interpreter to teach the actors/talent how to properly

sign. At the last minute, Taylor informed BURDICK that she needed to be there for the whole shoot to "entertain" the interpreter, as that was "not [his] staff's job".

49.   On or about December 2, 2014, Justin Chambers emailed BURDICK to inform her that she did not have adequate "time" accrued to take a preplanned and previously approved vacation at the end of the year, stating, "I wanted to give you a heads up that your scheduled time off is putting you in the hole heading into 2015. You have 4 days scheduled in December and just under 3 available. Essentially you will start 2015 with a -8.3 hrs of PTO." After responding that she was using a "floating holiday", Chambers responded, "You are correct. The last floater is being used toward the holiday time off. That said, the system may not be correctly reflecting your PTO totals, so you are either -8.3 or -0.3." As a result of this issue, BURDICK discussed the issue with Burkes Young, whom indicated that he would discuss it with Chambers and resolve the issue. However, on December 22, just days before the planned vacation, having heard nothing more about the issue, BURDICK asked Chambers if he had spoken with Young and worked out the issue, but Chambers informed her that Young had not discussed it with her.

50.   On or about December 10, 2014, Justin Chambers informed BURDICK that he was removing certain accounts from her and giving them to new AE's. BURDICK informed Chambers that one of the clients he was taking away was a difficult client to work with, and that BURDICK had established a relationship and rapport with them, suggesting that transferring that client may be problematic. Chambers agreed to leave the client with BURDICK, but instructed her, "Please go through your billing and find something that equals $60,000.00 in billing that we can move."

51.   During the conversation on December 10, Chambers also informed BURDICK that they were delaying the moving of an account from February to April. This account was one that required a considerable amount of paperwork to complete, and BURDICK again repeated that it was difficult for her to perform her duties generating new sales and client meetings out of the office due to such heavy work requirements in

13
COMPLAINT

the office. However, DEFENDANTS continued to stall in moving the account, commenting that it was because there was not anyone else of BURDICK's "Caliber" who could handle the work load.

52. During that same week, BURDICK learned that *no other* AE's were losing any accounts to the new AE's.

53. On or about December 15, 2014, having received an email over the weekend from a large client that was attempting to negotiate down rates, and whom had copied the email to Justin Chambers and Burkes Young, Young informed BURDICK that they would take the orders at the rates the client demanded, as "we would not turn away $72,000.00 in business for 2015". After expressing concerns over conflicts the account would have with other clients, Young informed BURDICK that she would "just have to deal with the preemptions that were generated and remind the clients how good of care you take care of them." BURDICK reiterated to Young that preemptions require a considerable amount of time at her desk to deal with, and would further prevent her from going out into the market to sell more business.

54. On or about January 2, 2015, on the day BURDICK returned from her vacation, Justin Chambers approached BURDICK and commented, "Just FYI, you're currently 6 out of 6 on new business."

55. On January 7, 2015, BURDICK spoke with Burkes Young regarding Steve Weinstein's leaving the station, at which time she expressed her frustrations with losing him. At that time she informed Young, "I'm tired. I'm just really tired of the change and all of the newness around here all the time. The team will have to once again go through meeting a new manager and learning how he operates." In response, Young told BURDICK, "do you know what I did the last time I was really tired? I quit. I quit my job. So I guess you'll either quit or you'll get over being tired and pull your head out."

56. Later in the day of January 7, Justin Chambers met with BURDICK and told her that they had decided against taking the accounts away from her that she had suggested, and were instead taking the large account early noted. After noting to

Chambers that the client was not likely to continue with purchasing time as they had with BURDICK, Chambers commented, "well, that's what we've decided to do." When BURDICK asked Chambers "Why?", he replied "because I have to cover Justin's [a new AE] salary, and I need that account to do it."

57. DEFENDANT'S policy is to give a minimum monthly pay to new or under-performing employees to cover "minimum wage" requirements, but then will require reimbursement from future commission payments at a rate of 100% repayment.

58. During that same conversation, BURDICK noted to Chambers that this action would likely cause problems, similar to another situation that had occurred. After she addressed that issue, Chambers then turned the subject and asked BURDICK for information about her new business for 2015. BURDICK responded to Chambers that "I don't have anything to report at this time", to which Chambers responded, "Well you're not meeting your goals for this year, and if this continues we will continue to take business off your desk and reward people who are making their goals." Chambers finished the conversation by instructing BURDICK, "I want a new business plan from you on my desk Friday."

59. As a result of the decisions to remove considerable accounts from BURDICK and give them to other AE's, and because DEFENDANTS had severely reduced BURDICK's budget to solicit and obtain new clients and business, mixed with the constant requirements of meetings and paperwork which prevented BURDICK from actually performing new sales work, and with the continued lack of response from H.R. to her ongoing problems and concerns with her supervisors and superiors, BURDICK found herself unable to continue performing the duties of her position.

60. On or about January 9, 2015, after determining that because of the actions of DEFENDANTS, she was no longer able to properly perform her job, BURDICK submitted a Letter of Resignation informing DEFENDANTS that she intended to cease her employment with them on January 30, 2015.

61.    At 12:30 pm on January 9, BURDICK submitted her letter to Justin Chambers indicating that she intended to work through January 30 to resolve her outstanding accounts and transition her accounts as needed. However, at 12:55 pm, while BURDICK was at lunch, Nancy Solis called BURDICK and told her, "Justin just told me you've given your two week notice. There is no need for you to return to the building. We will pack up your things and get it to you, and anything we don't know is yours or the stations we will give to you."

62.    Having told BURDICK not to return from her lunch to the building, Nancy Solis then informed BURDICK to return to the building at 2:30 pm to retrieve her belongings, turn in her keys, and then leave permanently.

63.    Contrary to internal policy, as BURDICK was not leaving to work for a competitor, DEFENDANTS chose to immediately terminate BURDICK'S employment at that time, and packed her belongings for her from her desk.

64.    When BURDICK returned at 2:30, she was escorted through the building, and after being given her pre-boxed belongings, Solis informed BURDICK, "you will get a survey via email about your experience here that you can fill out for us.". BURDICK replied and asked Solis, "So are you terminating me on the spot and not accepting my three weeks' notice?". Solis then responded, "I'm not sure, I'll have to get back to you", to which BURDICK then replied, "Ok, why don't you call me Monday when you know if you're terminating me or not."

65. On or about January 12, 2015, BURDICK called and spoke to Michael O'Brein, the Vice President of Sales at the corporate office, to thank him for the opportunity to work for DEFENDANTS, at which time he inquired where BURDICK was going for work. BURDICK responded "nowhere." When O'Brein asked BURDICK why she was leaving, BURDICK responded, "Justin [Chambers] and I were never going to get along" as well as the lack of response to the issues she had raised to DEFENDANTS. O'Brein, after informing BURDICK that he was sorry to hear she was leaving, also noted that he wished she had called sooner so he could have done

16
COMPLAINT

something about the situation. Although BURDICK had previously addressed the issue numerous times with her managers and human resources for DEFENDANTS, she noted for O'Brein that the "last straw" was having the accounts moved away from her. O'Brein replied, "that is not the direction I gave Bakersfield", and upon BURDICK informing O'Brein that she had then been escorted out of the building that day, he replied, "that is not company policy."

66.    Subsequent to speaking with O'Brein, Nancy Solis called and spoke with BURDICK, and claimed that DEFENDANTS were then trying to accept her resignation, but that she need not return to work to complete the term.

67.    At times before, as well as after BURDICK was terminated, DEFENDANTS had other employees that resigned and/or were quitting to go to work for competitors, of which none were treated similarly as BURDICK, with some being permitted to continue working up until actual departure, and none being "escorted" out of the building and off the premises.

68.    During the course of her employment with DEFENDANTS, and more specifically towards the end of her employment, BURDICK would find it necessary to leave the building to escape from the continued oppressive and abusive behavior by DEFENDANTS towards her in order to regain her composure and continue performing her duties.

69.    In regards to the times that BURDICK would leave the building, although she would frequently do so in order to go to client meetings or perform other job duties, DEFENDANTS would often comment among themselves and with other employees, or even to clients, that BURDICK was "out of the office" "taking a spa day", going to a "hair appointment", "manicure" or "pedicure" appointment, or otherwise referencing that she was using the time as personal time to take care of stereotypically "female" "pampering" activities, and not for proper business purposes.

70.    On various occasions, Justin Chambers would make inappropriate comments which BURDICK and others would hear, depicting and/or inferring sexually

17
COMPLAINT

discriminatory and/or harassing content and intent. As an example, but not as an exclusive list, on certain occasions Chambers commented to the effect that, when he had been working in sales, he hated competing with women because they "wore low cut blouses and short skirts", implying that women used sex and/or sexuality to make sales, and inferring that without such tactics, women would not have been able to compete with him or males to perform the job functions.

71.    On various occasions, Burkes Young would make inappropriate comments which BURDICK and others would hear depicting and/or inferring sexually discriminatory and/or harassing content and intent. As an example, but not as an exclusive list, on various occasions, Young would refer to other females, whom had independent sales agencies and whom competed heavily with him and/or his staff for clients, as "twunts", a contraction of two vulgar and derogatory words used towards females. On other occasions, Young would ask BURDICK if she thought other women, including those running competing agencies, were "sleeping with" or otherwise having sexual relations with clients to obtain the business.

72.    During the course of her employment, BURDICK was required to fill out weekly "time cards", that had been pre-generated by DEFENDANTS, and which indicated that she was working a steady 8 hour per day schedule. Although BURDICK routinely worked additional hours in mornings and evenings, DEFENDANTS' policies were that she was required to sign and submit this form, unaltered, in order to receive payment of her commissions.

73.    On or about January 16, 2015, BURDICK received information from a former client whom called to inform her that, after having had lunch with Justin Chambers and Burkes Young, wanted to inform BURDICK that Chambers and Young had make comments regarding BURDICK that she, in her opinion, believed were unprofessional and improper.

74.    Subsequent to working for DEFENDANTS, BURDICK elected to open her own business, which would compete with her former co-employees at KERO for business.

75.    After her departure, in addition to BURDICK soliciting new business, BURDICK was contacted by various previous clients inquiring about her departure from DEFENDANTS and expressing interest in BURDICK'S services.

76.    On or about June 24, 2015, Justin Chambers called BURDICK to inform her that she would not be allowed to attend the upcoming KERO "upfront", an event that KERO invites all paying advertisers to attend, as well as the agencies which represent them. In calling, Chambers expressed his purpose in calling as to inform BURDICK that they *did* invite her clients to attend, but stating, "I'm not sure if you've heard about the upfront yet, but both of your reps [clients] wanted to invite you. But because of the ongoing issues we will not be able to have you attend the upfront." No other agencies or representatives were precluded from attending with their clients, and in fact other agencies and sales persons did attend.

77.    On or about June 29, 2015, a former client of BURDICK'S called to inform her that a "manager" from DEFENDANTS had called to inform her that BURDICK had been saying derogatory or "catty" things about her and her family. Such assertions were false. In fact, BURDICK'S former superior, Burkes Young, previously made such comments about the person, to both BURDICK and others.

78.    Subsequent to opening her own office and agency, DEFENDANTS frequently would make derogatory, unprofessional, degrading, defaming and demeaning comments or statements involving BURDICK to various people in the industry, including but not limited to former and current clients of BURDICK, potential clients of BURDICK, and vendors of services in the market which BURDICK may utilize, all with the intent to coerce, pressure or compel those people to not conduct business with BURDICK.

79. After BURDICK opened her own office and agency, DEFENDANTS made it difficult and problematic for BURDICK'S clients to utilize DEFENDANT'S station for placing advertising if the client/business was represented by BURDICK.

80. As a result of DEFENDANTS actions regarding and relating to BURDICK after she opened her own competing agency, BURDICK experienced difficulty in obtaining and maintaining clients and business. As a result of DEFENDANT'S actions, BURDICK lost substantial business.

81. As a result of DEFENDANT'S actions, BURDICK suffered tremendous anxiety and other medical issues, requiring treatment.

82. Due to the continued actions of DEFENDANTS, BURDICK was forced to leave the industry and pursue employment/income from other sources.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

### A. – Commissions

83. BURDICK hereby re-alleges and incorporates the allegations set forth above in paragraphs 1 through 82 above as if set forth fully herein.

84. By way of written contract, BURDICK was to be compensated through payment of commissions based upon sales.

85. BURDICK'S compensation was comprised 100% of commissions.

86. Having performed the work necessary to create sales and market products on behalf of DEFENDANTS, BURDICK was entitled to the commissions from her efforts and sales she completed.

87. In addition to commissions for sales and transactions completed, BURDICK had a reasonable expectation in continued commissions from sales and services to, and revenue generated from her clients and efforts.

88. Although BURDICK had performed the work and effort to obtain clients and make sales, with a reasonable expectation of continued and ongoing sales to those

clients, DEFENDANTS at times would arbitrarily remove those clients from BURDICK and transfer them to other sales associates, whereas those associates would receive the commissions from the sales and efforts of BURDICK.

89.     As was explained by DEFENDANTS to BURDICK, transferring her clients and sales, and thus commissions, to other new associates was necessary "to cover [the new associate]'s salary, and [DEFENDANTS] need that account [and the resulting commissions] to do it."

90.     Upon DEFENDANTS removing various accounts from BURDICK, BURDICK was at times informed that such was being done in an effort to increase the income of other AE's with DEFENDANTS, and presumably lower BURDICK'S resulting income, in an order to "make things more balanced" between her and the other AE's.

91.     BURDICK was one of, if not the highest performing sales associate working for DEFENDANTS during her employment, which resulted in commissions and income in excess of other workers. DEFENDANTS would comment to BURDICK that she was earning considerably more than other associates, and that others felt that was not "fair". Additionally, DEFENDANTS would comment and insinuate that since BURDICK was female, working in a "man's" position, that her earning considerably more than her male counterparts was creating animosity and problems for DEFENDANTS with the other associates. As such, DEFENDANTS removed clients and accounts from BURDICK which she had worked and generated, after BURDICK had established repeated business with them, and transferred them, and the resulting commissions, to other associates, claiming it was to "make things fair".

92.     DEFENDANTS would at times remove accounts and clients from BURDICK and assign them to other associates so as to reduce BURDICK'S commissions and income in retaliation for her actions in contesting the behavior of DEFENDANTS.

93.    The above referenced conduct of DEFENDANTS in removing accounts and the anticipated commissions therefrom away from BURDICK breached the terms of the contract between DEFENDANTS and BURDICK.

94.    The total loss of commissions that were removed from BURDICK during her employment are currently unknown, but believed to be in excess of $100,000.00.

**B. Employment Terms-- General**

95.    Within the terms of the contract between DEFENDANTS and BURDICK were included terms relating to proper management of employees, along with certain policies and procedures for addressing grievances and complaints.

96.    During the course of her employment, BURDICK frequently expressed her concerns and complaints to her managers, as well as to the Human Resources Officer, as set forth within the terms of her employment.

97.    DEFENDANTS breached the terms of the agreement by failing to properly address and manage the employees with whom BURDICK was having problems, and failed to follow the terms of the written policies and procedures, which were made part of the contract. Similarly, DEFENDANTS breached the terms of the agreement by failing to provide adequate and proper Human Resource services as set forth in the agreement.

98.    Because of the failures and breaches by DEFENDANTS, BURDICK was forced out and constructively removed from her position, and although she had informed DEFENDANTS of her plans to resign her position due to their failures and breaches, DEFENDANTS unilaterally terminated BURDICK'S employment effective January 9, 2015.

99.    As a result of the breaches by DEFENDANTS, BURDICK was precluded from receiving the normal expected income from the accounts she had generated, and would likely and within the expected course and scope of business maintained, generated or advanced, which she would have reasonably expected to receive on a

continuing and ongoing basis. At the time of her constructive/actual termination, BURDICK was earning in excess of $100,000.00 per year.

## SECOND CAUSE OF ACTION

### (Sexual Harassment, Discrimination, And Retaliation)

100. BURDICK hereby re-alleges and incorporates the allegations set forth above in paragraphs 1 through 99 above as if set forth fully herein.

101. California Government Code §12900, et seq. (otherwise known as the "Fair Employment and Housing Act", or "F.E.H.A.") prohibits discrimination, retaliation and harassment in employment based upon, among other things, a person's gender.

102. At the time of the issues and instances complained of herein, BURDICK was an employee of DEFENDANTS covered by F.E.H.A..

103. DEFENDANTS, and each of them, discriminated and retaliated against BURDICK based upon her gender in violation of the F.E.H.A. by taking the actions set forth above, and more specifically, but without limitation or exclusiveness, the actions taken against BURDICK based upon her success in sales, the decision to refuse her an opportunity to apply for a promotion, failing to properly supervise her managers, in removing clients and accounts she had generated ongoing sales with, and restricting her access to resources to generate new and replacement business.

104. During the time BURDICK was employed with DEFENDANTS, there was a disproportionate number of men working in the higher level positions, and DEFENDANTS chose to, or otherwise failed to promote or hire females for lead and management level positions.

105. Because of the DEFENDANTS, and each of their discriminatory, retaliatory and harassing actions, BURDICK was precluded from continuing her employment.

23
COMPLAINT

106.   BURDICK has suffered damages, including loss of earned income, loss of health insurance and benefits, emotional distress, and other benefits of her employment, the amounts of which are to be determined at the time of trial.

107.   The actions of the DEFENDANTS, and each of them, were willful, wanton, reckless, intentional, done with malice, and/or completed with reckless disregard or care for the injury of BURDICK, and therefore the imposition of punitive and/or exemplary damages are appropriate.

108.   Pursuant to the terms of F.E.H.A., BURDICK is entitled to the recovery of reasonable attorney's fees.

## THIRD CAUSE OF ACTION

### (Breach Of Covenant Of Good Faith And Fair Dealing)

109.   BURDICK hereby re-alleges and incorporates the allegations set forth above in paragraphs 1 through 108 above as if set forth fully herein.

110.   Inclusive in all contracts and employment settings is an inherent covenant of good faith and fair dealing between the parties or employer and employee.

111.   Based upon the agreement for employment, DEFENDANTS had an obligation to deal fairly and in good faith with BURDICK.

112.   As a result of, and based on the actions set forth above, DEFENDANTS breached the covenant of good faith and fair dealing with BURDICK.

113.   As a result of the breach of the covenant of good faith and fair dealing by DEFENDANTS, BURDICK has suffered damages, including loss of earned income, health insurance and benefits, mental and emotional distress, and other benefits of her employment with DEFENDANTS, the amounts of which are to be determined at the time of trial.

114.   The actions of the DEFENDANTS, and each of them, were willful, wanton, reckless, intentional, done with malice, and/or completed with reckless disregard or care for the injury of BURDICK, and therefore the imposition of punitive and/or exemplary damages are appropriate.

## FOURTH CAUSE OF ACTION

### (Wrongful/Constructive Termination In Violation Of Public Policy)

115.   BURDICK hereby re-alleges and incorporates the allegations set forth above in paragraphs 1 through 114 above as if set forth fully herein.

116.   California has a strong public policy prohibiting discrimination, harassment and retaliation against employees in the workplace.

117.   As set forth above, DEFENDANTS, and each of them, created a working environment charged with discrimination, harassment and retaliation against BURDICK, such that she was constructively and/or actually terminated from her position with DEFENDANTS.

118.   Although BURDICK had been constructively discharged, and intended to leave her position through resignation, DEFENDANTS elected to actually terminate BURDICK.

119.   Because of the constructive and later actual termination, BURDICK has suffered damages, including loss of earned income, health insurance and benefits, mental and emotional distress, and other benefits of her employment with DEFENDANTS, the amounts of which are to be determined at the time of trial.

120.   The actions of the DEFENDANTS, and each of them, were willful, wanton, reckless, intentional, done with malice, and/or completed with reckless disregard or care for the injury of BURDICK, and therefore the imposition of punitive and/or exemplary damages are appropriate.

## FIFTH CAUSE OF ACTION

### (Failure To Properly Supervise)

121.   BURDICK hereby re-alleges and incorporates the allegations set forth above in paragraphs 1 through 120 above as if set forth fully herein.

122. This is an action for damages based on the failure of DEFENDANTS to prevent discrimination and retaliation. This action is brought pursuant to California Fair Employment and Housing Act (FEHA). Under FEHA, it is an unlawful employment practice to fail to take all reasonable steps to prevent employment discrimination and/or harassment on the basis of sex, and retaliation for seeking redress of grievances with the employer.

123. DEFENDANTS failed to take the necessary steps to prevent discrimination and to prevent retaliation for engaging in protected activities and belonging to a protected class in the work place. As a result of the failure by DEFENDANTS to prevent illegal employment discrimination, harassment and retaliation, Plaintiff has, and will continue to suffer loss of wages/salary, benefits, and other forms of compensation in an amount to be determined according to proof.

124. As a result of the aforementioned failure to prevent discrimination and retaliation in the work place, BURDICK has been held up to great derision and embarrassment by now ex-co-employees, professional and business associates, former and current clients, friends and members of the community at large.

125. The conduct which BURDICK complains of in this Complaint, and which is alleged above, was carried out by DEFENDANTS willfully, intentionally, with oppression, malice and fraud, and with a conscious disregard of BURDICK'S rights as a protected class member. As such BURDICK is entitled to an award of exemplary damages according to proof. The aforementioned conduct on which punitive damages are alleged, as described herein above, was done with the advance knowledge by DEFENDANT'S officers, directors and/or managing supervisors against her and in violation of public policy. This action is not preempted by the California Workers' Compensation Act because discrimination and retaliation is not a risk or condition of employment.

## SIXTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

126. BURDICK hereby re-alleges and incorporates the allegations set forth above in paragraphs 1 through 125 above as if set forth fully herein.

127. The acts described hereinabove are separately, as well as in their totality, so extreme and outrageous that they cannot be tolerated by a civilized society.

128. As a result of the aforementioned failure to prevent discrimination and harassment in the work place, BURDICK has been held up to great derision and embarrassment by now ex-co-employees, professional and business associates, former and current clients, friends and members of the community at large.

129. The conduct which BURDICK complains of in this complaint, as set forth above, was the proximate and actual cause of emotional and mental distress, which permeated and continued to affect BURDICK after BURDICK'S termination from her employment.

130. The conduct which BURDICK complains of in this complaint, as set forth above, was carried out by DEFENDANTS willfully, intentionally, and with oppression, malice and fraud, and was carried out with a conscious disregard of Plaintiff's rights as a protected class member. As such Plaintiff is entitled to an award of exemplary damages according to proof. The aforementioned conduct, on which punitive damages are alleged, as set forth above, was done with the advance knowledge by DEFENDANT'S officers, directors and/or managing supervisors against BURDICK and in violation of public policy.

## SEVENTH CAUSE OF ACTION

### (Tortious Interference With Prospective Economic Advantage)

131. BURDICK hereby re-alleges and incorporates the allegations set forth above in paragraphs 1 through 130 above as if set forth fully herein

132. Subsequent to BURDICK'S termination from employment with DEFENDANTS, BURDICK attempted to establish her own business within the same market in which she had previously been working. As such, BURDICK began her own advertising and marketing office and agency.

133. Subsequent to BURDICK'S termination and having then decided to open her own business, BURDICK, without solicitation or encouragement, was contacted by various former and new potential clients seeking her services.

134. As set forth above, DEFENDANTS, at various times and instances, made derogatory, degrading, and defaming comments regarding BURDICK towards her then new, as well as to her former clients, and to other members within her professional community in an attempt to discourage and dissuade those clients from utilizing and/or employing BURDICK, from leaving DEFENDANTS, and/or to otherwise prevent BURDICK from obtaining clients and business.

135. The actions of the DEFENDANTS, and each of them, as set forth above, were undertaken, completed and/or performed with the intent to deprive BURDICK of clients, revenue, and business relations, and to otherwise interfere, restrict and/or obstruct BURDICKS' business.

136. The actions of the DEFENDANTS, and each of them, as set forth above, were willful, wanton, reckless, intentional, done with malice, and/or completed with reckless disregard or care for the injury of BURDICK, and therefore the imposition of punitive and/or exemplary damages are appropriate.

## EIGHTH CAUSE OF ACTION

### (Violation of Business and Profession Code §17200—

### Unfair Business Practices,)

137. PLAINTIFF hereby re-alleges and incorporates the allegations set forth above in paragraphs 1 through 136 above as if set forth fully herein.

138. DEFENDANTS, and each of them, have engaged in a pattern of soliciting clients within the general market, and specifically those whom they knew or reasonably should have known were clients and/or which BURDICK had an agency agreement with, or which BURDICK would reasonably likely encounter, through the use of making disparaging, derogatory, and/or defamatory comments and/or assertions regarding BURDICK.

139. DEFENDANTS, within the scope of a sponsored event, in which other agencies and their clients were invited to attend, solicited and invited known clients of BURDICK, with the intent to solicit their business, but precluded BURDICK from attending therewith, despite having invited, allowed, and encourage the attendance of the agents whom represented other potential clients.

140. DEFENDANTS proceeded with multiple efforts to unfairly prevent BURDICK from participating within the market, and actively endeavored to preclude, prevent, interfere with, and otherwise impede her from competing in the market.

141. Inclusive in the acts of DEFENDANTS, as the owner/operator of a media outlet in which BURDICK would sell advertising, DEFENDANTS endeavored to preclude, restrict, and/or obstruct BURDICK'S ability to utilize that forum in an effort to create complications between her/her agency and her/her agency's clients.

142. Because of the foregoing, BURDICK was damaged in her profession and business by loss of clients and/or opportunities to participate fairly within the market.

143. Based on the foregoing, DEFENDANTS, and each of them, have engaged in a course of conduct constituting unfair business practices, within the meaning of Business and Professions Code §17200 et seq.

144. By reason of the foregoing, PLAINTIFF has suffered, and continues to suffer damages in a sum to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, BURDICK PRAYS JUDGMENT AS FOLLOWS:

1. For back pay, front pay, and other monetary relief in a sum according to proof;

2. For general damages in an amount according to proof;

3.    For interest on the sum of damages awarded;

4.    For punitive and/or exemplary damages according to proof;

5.    For reasonable attorney's fees pursuant to Government Code Section 12965(b);

6.    For cost of suit herein incurred; and

7.    For such other relief as the court deems just and proper.

Dated: December 27, 2016                              WISE LAW OFFICE

By: _____
     JEFFREY L. WISE, Esq.

30
COMPLAINT

## PROOF OF SERVICE

I, Charlene Stamps, declare:

I am employed in Los Angeles County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 11601 Wilshire Boulevard , Suite 1400, Los Angeles, CA  90025-0509.  On April 27, 2017, I served a copy of the within document(s):  **NOTICE OF REMOVAL**

☑   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☐   by placing the document(s) listed above in a sealed  envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a [service company]  agent for delivery.

☐   by causing to be personally delivered the document(s) listed above to the person(s) at the address(es) set forth below.

Jeffrey L. Wise
WISE LAW OFFICE
1315 "L" Street
Bakerfield, CA 93301
(661) 327-0622
(661) 328-9977

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on April 27, 2017, at Los Angeles, California.

Charlene Stamps

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

PROOF OF SERVICE

610671283.1